**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

IN RE: ROCK 'N PLAY SLEEPER
MARKETING, SALES PRACTICES, AND
PRODUCTS LIABILITY LITIGATION

MDL No. 1:19-md-2903

This Document Relates to: ALL CASES

---

**REPLY DECLARATION OF J. MICHAEL DENNIS, Ph.D. IN RESPONSE TO RAN
KIVETZ, PH.D. REBUTTAL DECLARATION**

**January 13, 2022**

I, J. Michael Dennis, Ph.D., declare as follows:

1.      I have been retained by counsel for Plaintiffs in *In Re: Rock 'N Play Sleeper,
Marketing, Sales Practices, and Products Liability Litigation.*

2.      If called upon to testify, I would and could testify competently to all such subject
matter in this Reply Expert Report. Plaintiffs asked me to review and provide my expert comments
on the Rebuttal Expert Report of Dr. Ran Kivetz (dated December 13, 2021).

3.      My current *curriculum vitae* is attached, including a list of my expert testimony in
the past four years.

4.      Plaintiffs' counsel has retained my services at the hourly rate of $500. My
compensation is not contingent on the results of my work or any outcome of the litigation.

5.      My expert opinions stated in my Reply Expert Report are my opinions and only my
opinions.

<u>**SUMMARY OF QUALIFICATIONS**</u>

6.      My previously filed expert report (dated October 12, 2021) provides my
qualifications. My current resume, which contains more information on my background and
qualifications, is contained in an Attachment.

## ASSIGNMENT

7.      Plaintiffs' counsel asked me to reply to criticisms made in the Rebuttal Expert Report of Defendants' proffered expert Dr. Ran Kivetz (report submitted December 13, 2021, henceforth "Kivetz Rebuttal Report"). Below I reply to Dr. Kivetz.

## BACKGROUND

8.      I previously authored an expert report (dated October 12, 2021) where I reported on a consumer survey that I conducted to address issues in this litigation. On the basis of my reliable consumer survey, I concluded that the reasonable consumer was in fact misled by Defendants' labelling practices, as indicated by a substantial majority of my respondents understanding the Defendants' packaging to convey meanings consistent with the Plaintiffs' allegations. Large majorities of consumers perceived the Defendants' product packaging to communicate that the products were safe for babies, that they were intended to be used for sleeping and napping, and that they would not hurt the babies. Furthermore, my consumer survey found that these consumer perceptions are material to consumers' purchasing decisions. Finally, my survey found that a simple warning disclaimer on the product packaging would cause a substantial decrease in consumers' interest in purchasing the products.

9.      In my October 12, 2021 expert report, I also provided criticisms of Dr. Kivetz's consumer survey documented in his expert report (Dkt. 166-1, dated June 16, 2021). I concluded that Dr. Kivetz's consumer survey cannot substantiate his conclusion, which was that the alleged misrepresentations and omissions do not result in an increase in consumers' purchase likelihood for the Defendants' products. I detailed the several flaws in Dr. Kivetz's survey which individually and combined rendered his data useless for addressing issues in the litigation. Among the criticisms I made, I emphasized that Dr. Kivetz's fatal mistake was not to control for the preconceptions and preexisting beliefs and attitudes of his respondents who were predisposed to believe the Defendants' products are safe for babies. I argued that this failure resulted in a systematic distortion in the answers that Dr. Kivetz's respondents provided.

## SUMMARY OF CONCLUSIONS

10.     As a court-qualified research expert providing reliable information to the trier of fact, my task is to "proceed on the hypothesis that the defendant committed the harmful act and that the act was unlawful."[1]

11.     To provide such information, I prepared and executed a consumer survey using industry-standard (and court-accepted) methodologies to measure the extent to which consumers' perceptions of the Defendants' products are consistent with the Plaintiffs' theory of liability, that is, that the packaging of the products misled the consumers into believing that the products are safe for use by babies, including for overnight or prolonged sleep.[2] My consumer survey also measured whether these alleged misleading representations and omissions are material to consumers' purchasing decisions.

12.     The Kivetz Rebuttal Report does not identify any flaws in my research design. Dr. Kivetz criticizes my consumer survey for design features that enabled me to provide reliable data to the Court, such as in my use of direct and close-ended survey questions asking for respondents' perceptions of the challenged products.

13.     Further, any survey requires making several methodological choices, with the objective of minimizing the risk of unreliable or invalid data. Yet the Kivetz Rebuttal Report, in its effort to identify potential pitfalls in the survey design that I made, fails to bring a critical lens to the design of his own consumer survey prepared for this litigation or to acknowledge the methodological trade-off considerations in the decisions I made in designing my consumer survey.

14.     In many ways, the shortcomings in Dr. Kivetz's consumer survey are a useful contrast to the design choices I made in my own consumer perception survey. Dr. Kivetz based his survey on an experimental cause-effect design, which in theory is an acceptable methodology.

15.     But, in his implementation, Dr. Kivetz showed the respondents an actual Fisher-Price branded product (Kivetz Expert Report, Dkt. 166-1, pp. 13-15). As a result, both test-group and control-group consumers participating in Dr. Kivetz's survey could rely on their pre-existing perceptions and brand loyalty to Fisher Price in answering his purchase intention survey question. As a result, the impact of his experiment was blunted as respondents answered his questions on

---

[1] Allen, M., Hall, R., and Lazear, V. (2011), "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, Federal Judicial Center, National Research Council of the National Academies, pp. 425-502, at p. 432.
[2] Consolidated Amended Complaint, October 28, 2019, ¶ 3.

the basis of pre-existing beliefs and attitudes towards the Fisher-Price products, rather than on the basis of the subtle changes he made to the control-group packaging. In contrast, my consumer survey does not have this design shortcoming because the reliability of my survey does not rely on an experimental design (that requires respondents to be capable of being sensitive to his altered packaging).

16.    Moreover, I selected the relevant sample of consumers.

17.    Finally, I constructed the consumer survey for my assignment based on my decades of experience, assuring that my respondents understood my consumer survey. When appropriately analyzed, my survey data are generalizable to the proposed class members.

18.    My survey data demonstrate conclusively that consumers perceive the product packaging to communicate that the products are safe for use by babies. My survey data show that **89.7%** and **91.9%** of the respondents perceived the packaging to communicate that the product is "safe for babies to use" and "intended to be able to sleep and nap in it," respectively. Substantial majorities of my consumer respondents also reported being likely or extremely likely to purchase the product because of their specific understandings of the packaging (which the Plaintiffs allege are based on misrepresentation or omission). For **85.2%** of the consumers, their understanding of the packaging to communicate that "it is intended for babies to be able to sleep and nap in it" is material (making them likely to purchase the product). For **82.5%**, their understanding of the packaging to communicate that the product is "Safe for babies to use" was material.

19.    When Dr. Kivetz disagrees with my methodological design decisions, he makes assertions that those decisions resulted in a variety of harms to the validity and reliability of my survey data, but never does he present any data in support of his assertions. Dr. Kivetz's criticism are only theoretical. He states with certainty that those harms are present in my data, but not once does Dr. Kivetz provide any data in support of his opinion.

20.    For these and other reasons, the Kivetz Rebuttal Report has not affected my confidence in the reliability or validity of my consumer survey. I continue to hold as my expert opinion that my consumer survey in this case provides a reliable and accurate measurement of the extent to which class members understand the Defendants' Products to communicate that the Products will be safe for use by babies.

## MY CONSUMER SURVEY IN *IN RE: ROCK 'N PLAY SLEEPER* FOLLOWS DESIGN PRINCIPLES CONSISTENT WITH MY PAST LITIGATION SURVEYS

21.     As a foundational matter with respect to Dr. Kivetz's challenges, I am a court-qualified research expert in consumer surveys and analysis. I have designed, conducted, and reported on consumer surveys in the context of various class-action litigations on many occasions, including but not limited to the following: *Sharpe v. A&W Concentrate Co.*, No. 19-CV-768 (BMC), 2021 WL 3721392 (E.D.N.Y. July 23, 2021); *McMorrow v. Mondelez Int'l, Inc.*, No. 17-CV-2327-BAS-JLB, 2021 WL 859137 (S.D. Cal. Mar. 8, 2021); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018); *de Lacour v. Colgate-Palmolive Co.*, 338 F.R.D. 324 (S.D.N.Y. 2021); *Bowling v. Johnson & Johnson*, No. 17-CV-3982 (AJN), 2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019); *Gregorio. v The Clorox Company*, No. 4:17-cv-03824-PJH (N.D. Cal.); *Cabrera v. Bayer Healthcare LLC.*, No. LA CV17-08525 JAK (JPRx) (C.D. Cal.); *Willis v. Colgate-Palmolive Co.*, No. 2:19-CV-08542-JGB-RAO (C.D. Cal.); *Benson v. Newell Brands, Inc.*, No. 19-cv-06836 (N.D. Ill.); *Broomfield v. Craft Brew Alliance, Inc.*, No. 5:17-cv-01027-BLF, (N.D. Cal.); *Maeda v. Kennedy Endeavors, Inc.*, No. 1:18-CV-00459-JAO-WRP, (D. Hawaii). As I did in each of those matters, the consumer survey I conducted in *In Re: Rock 'N Play Sleeper* was designed in accordance with industry standards, judicial guidance, and based on my decades of experience and expertise.

22.     Whenever I design and conduct a consumer survey, including in this case, I take great care to ensure that I follow sound research practices and industry standards by considering publications and technical materials generally accepted by the survey research community.[3]

23.     When I have offered expert opinions in other matters that are also based on these industry standards, experts retained by the Defendants predictably provide rebuttal expert opinions that mirror what Dr. Kivetz offers here, including that my survey is "fatally flawed" by purportedly not following "multiple fundamental survey design principles" (Kivetz Rebuttal Report, ¶ 12), for purportedly having a "a highly leading and biased 'materiality' test" (Kivetz Rebuttal Report, ¶ 13), for purportedly using "extremely leading and biased" survey questions (Kivetz Rebuttal Report, ¶¶ 14-15), for purportedly failing to approximate marketplace conditions in my survey

---

[3] I identified some of the relevant treatises in my October 12, 2021 expert report, including Robert Groves et al. in their survey research textbook, <u>Survey Methodology</u> (Second Edition), Peter Marsden and James Wright in the <u>Handbook of Survey Research</u> (Second Edition), Norman Bradburn et al. in <u>Asking Questions</u>, Roger Tourangeau et al. in <u>The Psychology of Survey Response</u>, and Howard Schuman and Stanley Presser in <u>Questions and Answers in Attitude Surveys</u>.

(Kivetz Rebuttal Report, ¶ 16), for not using an experimental design having test and control groups (Kivetz Rebuttal Report, ¶ 17), and for using closed-ended survey questions instead of open-ended survey questions that, according to Dr. Kivetz, "induced severe demand, focalism, and order biases, as well as guessing behavior" (Kivetz Rebuttal Report, ¶ 85).

24.    As I have explained in those previous contexts, and explain again here, my consumer surveys do not have the flaws typically alleged by defendants' experts, and by Dr. Kivetz here. Dr. Kivetz characterizes my survey as having "violated every principle of scientific surveys" (Kivetz Rebuttal Report, ¶ 53) and as being "nonstandard" (Kivetz Rebuttal Report, ¶ 54), when in fact my survey methodology is based on traditional public opinion survey research practices as founded by George Gallup, Harry M. Field and the earliest practitioners of sample-based statistical surveys when the Association for Public Opinion Research was founded in 1947. This tradition continues today as the methodological backbone of the federal statistical system and public opinion research industry which I am proud to represent in my daily work as a survey research professional.

25.    My surveys prepared in the context of litigation follow industry-standard practices in using closed-ended survey questions, for presenting questions that effectively disguise the research objectives to prevent "demand effects" and "focalism bias," and to assure that I have selected the relevant consumers for the survey. My responses to Dr. Kivetz's criticisms below are essentially the same to what I have had to say in response to defendants' experts in other matters where my proposed surveys were court-approved, including but not limited to *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, *de Lacour v. Colgate-Palmolive Co.*, *Maeda v. Kennedy Endeavors, Inc.*, and *Benson v. Newell Brands, Inc.*

26.    Dr. Kivetz also complains about my use of closed-ended survey questions, which he warns, can "suggest an answer." (Quoting Keller in Kivetz Rebuttal Report, ¶¶ 86). Dr. Kivetz argues for the use of open-ended survey questions "which require respondents to formulate answers in their own words." (Kivetz Rebuttal Report, ¶ 86, again quoting Keller).

27.    Dr. Kivetz's opinion runs counter to the collective wisdom of survey research experts. For quantitative surveys (not qualitative research), the use of closed-ended survey questions (not open-ended questions) is a more generally acceptable question format in the survey research industry (about which, more later).[4]

---

[4] Bradburn, N. M., Sudman, S., & Wansink, B. 2004. *Asking Questions: A Practical Guide to Questionnaire Design*, p. 167.

28.    In addition, I have consistently used the closed-ended question format in my consumer perceptions surveys prepared in the context of litigation, including but not limited to the following cases: *Miles v. Philip Morris*, *Zill v. Sprint*, *Kangadis v. Ebin*, *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, *Bowling v. Johnson & Johnson*, *Cabrera v. Bayer Healthcare LLC.*, *Willis v. Colgate-Palmolive Co.*, *Broomfield v. Craft Brew Alliance, Inc.*, *Sharpe v. A&W Concentrate Co.*, *Benson v. Newell Brands, Inc.*, and *Maeda v. Kennedy Endeavors, Inc.* I have used the closed-ended question format in these and other cases to provide courts reliable information about consumers' perceptions of challenged claims.

29.    Dr. Kivetz also argues that I should have used a "proper control" to "measure the extent of 'noise' or 'error' in the survey" (Kivetz Rebuttal Report, ¶ 136). Again, I have routinely provided the courts reliable information conducting consumer surveys without a control group as specified by Dr. Kivetz. Defendants' expert exaggerates the potential error introduced by so-called "noise" in survey responses to cast doubt on the accuracy of surveys measuring consumers' perception of label claims and product packaging.

30.    In my description of my past consumer surveys conducted in the context of litigation, I have cited more than a dozen litigations for which I have conducted consumer perceptions surveys, including my consumer survey conducted in this litigation (Dennis Expert Report, October 12, 2021). *None* of these used a control group as suggested by Dr. Kivetz. I have demonstrated in my expert reports that carefully constructed consumer surveys relying on direct measurement of consumer perceptions can yield reliable information useful to the courts.

## FURTHER REPLIES TO DR. KIVETZ'S SPECIFIC CRITICISMS OF MY CONSUMER SURVEY

31.    <u>Reply to Dr. Kivetz's criticism that my survey results demonstrate a lack of commonality and therefore are not consistent with the Plaintiffs' position in this litigation</u>. Dr. Kivetz's argues, however unpersuasively, that my survey does not support the Plaintiffs' position because almost 60% of my respondents stated an interest in purchasing the Defendants' products after being shown a disclaimer that I drafted and presented to the respondents. I worded a conservative, non-alarming disclaimer that warns that the product "carries the risk of infant fatalities or other serious health problems," which corresponds to Plaintiffs' allegations (which my survey is appropriately testing).

32.    After showing the respondents the disclaimer in my survey, the materiality of the Defendants' product packaging dropped 28.2 percentage points, from 86.7% to 58.5%. That is to

say, the material effectiveness of the allegedly deceptive product packaging is reduced by 28.2 percentage points (32.5% actual loss) as a result of a single disclaimer on the package. I concluded in my expert report that the survey finding is directionally conclusive that a simple warning disclaimer on the products would have resulted in a substantial loss of sales for the Defendants' products.

33.    Dr. Kivetz's seems to find cause for celebration that 28.2% of the respondents – instead of 100% – were persuaded by the disclaimer to *no longer be interested in purchasing the Products*. Dr. Kivetz's threshold for lack of commonality is remarkable. In my experience, well-managed businesses would be alarmed by the prospect that a change in the product packaging could result in a loss of approximately 30% of their customers. Not Dr Kivetz. He seems to think this is good news for the Defendants that approximately a third of the Defendants' customers would no longer be interested in purchasing the Products as a result of a conservatively worded disclaimer placed on the packaging.

34.    Dr. Kivetz appears to believe that anything less than unanimity in respondents' stated preferences is evidence of "lack of commonality."  This is not a realistic position. Unanimity in surveys is elusive and, in my experience, unattainable.

35.     Dr. Kivetz also appears to have some naivete about the power of disclaimers to discourage sales of products. It is not reasonable to expect a conservatively worded disclaimer to convert all purchasers into non-purchasers. We all know as consumers that disclaimers disclosing health risks are only partially successful in reducing sales of harmful products, as evidenced by the fact that the Office of the Surgeon General's warnings about tobacco use have been in place for over 50 years – yet we still carry as a society the burden of the health care costs and increased mortality and morbidity resulting from continued tobacco use.

36.    My consumer survey reliably provided information to the Court that supports the Plaintiffs' theory that the Defendants' omission of a safety disclaimer was material to the purchase decisions of consumers.

37.    <u>Reply to Dr. Kivetz's criticism that the materiality test in my consumer survey involved a disclaimer that is "highly leading, biased, and conducive to severe demand effects."</u> Contrary to Dr. Kivetz's complaint, the disclaimer in my survey was conservatively worded. My task was to operationalize the Plaintiffs' theory of liability with respect to the omission of a safety disclaimer by drafting a disclaimer that would inform survey respondents of the potential safety

risks of the product. Dr. Kivetz's disagreement is, in reality, not with the wording of my disclaimer but with the Plaintiffs' theory of liability (which I operationalized in my survey).

38.    The actual disclaimer shown to my respondents is below, as documented in my October 12, 2021 expert report (¶ 103):

**Disclaimer Shown Respondents in the Dennis Consumer Survey**

> **THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS.**

39.    Notably, nowhere in Dr. Kivetz's report does he take issue with the objective merits of my disclaimer or take issue with the basis of my disclaimer in the fact that the Defendants were forced to recall and stop marketing the Products.

40.    Instead, Dr. Kivetz (¶¶ 61-62) quibbles with my expert report because I did not include in the main body of the report the survey wording that preceded the actual disclaimer (but, of course, I included all the survey wording in my attached survey questionnaire). Dr. Kivetz argues that there is a contradiction in my expert report between my description of the disclaimer as "neutral" and "undramatic" and the survey wording that preceded the disclaimer in my survey (as documented in my survey questionnaire). In the wording that preceded the disclaimer, I provided context for the hypothetical scenario of a disclaimer on the Products, followed by the actual disclaimer (shown in bold), as displayed below:

> Suppose the manufacturer of the product put this warning label on the front of the packaging because of actual injuries and fatalities that occurred in real life.
>
> **THIS SLEEPER PRODUCT CARRIES THE RISK OF INFANT FATALITIES OR OTHER SERIOUS HEALTH PROBLEMS**

41.    *Contra* Dr. Kivetz, there is not a "contradiction."  I accurately described the disclaimer as "neutral" and "undramatic," which it is. I even documented in my October 12, 2021 expert report an example of a dramatic disclaimer based on the model of the U.S. Surgeon General's warning labels for tobacco products. With respect to the prefacing statement, I followed standard survey research practice by providing the respondents context so that they would accept the hypothetical scenario as the basis for answering my survey question.

9

42.     Dr. Kivetz is truly having his cake and eating it too. He cannot have it both ways. While on the one hand he argues that my disclaimer is "highly leading, biased, and conducive to severe demand effects" that produces findings in the interests of the Plaintiffs, he also contends that my survey supports the Defendants' interests since many consumers still expressed an interest in purchasing the Products after being shown the disclaimer. If my disclaimer actually produced "severe demand effects" – as Dr. Kivetz claims – there is no evidence of such demand effects in my survey data since a majority of respondents still stated an interest in purchasing the Products after seeing the disclaimer.

43.     <u>Reply to Dr. Kivetz's criticism that my consumer perception survey relied on leading closed-ended survey questions that generated severe focalism, demand, and order biases.</u> There is no merit to Dr. Kivetz's criticisms that my consumer perception questions are "leading" and "generate severe focalism, demand, and other biases." Dr. Kivetz has no data-driven bases for his criticisms. Dr. Kivetz's criticisms are speculative only. Contrary to Dr. Kivetz's assertions, my survey questions are, in fact, non-leading and unbiased. I simply asked respondents directly what they perceived the product packaging to be communicating to them. Dr. Kivetz acts surprised to learn from my survey that consumers would perceive the packaging to be communicating that the Products are safe to use for babies, despite the fact that the product packaging blatantly refers to its use by babies for sleeping.

44.     I always strive to draft unbiased and neutral survey questions designed to collect accurate and reliable information. My research often has had to meet the standards of the Federal statistical system that requires the highest levels of professional integrity and scientific best practices.

45.     My survey does not signal to respondents how to answer the survey questions. Even a casual review of my questionnaire will reveal that my survey is unbiased. For example, in the consumer perceptions questions, I provide respondents a "Don't know / not sure" response option and a balanced and mutually exclusive list of response options. I did not lead the respondents or force them to select responses from constrained options. Respondents are entirely undirected by my survey on how to answer the survey questions.

46.     In a particularly bold and baseless allegation, Dr. Kivetz implies that my selection of methodology resulted in my consumer perception survey "creating 'evidence' of various consumer preferences and perceptions that, in reality, do not exist." (Kivetz Rebuttal Report, ¶ 53). Dr. Kivetz is arguing that my survey is creating survey results that are not based in the actual

10

preferences and perceptions of consumers. The argument has no foundation. Dr. Kivetz has no survey data to dispute my findings that consumers understood the Defendants' packaging to be communicating that the Products are safe for use by babies.

47.    Dr. Kivetz's argument is farcical on its face. The fact here is that the challenged product packaging – which Plaintiffs allege is false and misleading – contains the word "Sleeper" in the product name and contains this descriptor immediately below the Fisher Price brand logo on the front panel: "Baby can sleep at a comfortable incline all night long!" Even though the product name and product packaging is directly communicating that the product is to be used for babies to sleep in, Dr. Kivetz attempts to construct an implausible argument that my survey results reflect a "seriously flawed methodology," and reflect "leading" and "biased" survey questions – when the logical and straightforward conclusion is simply that my respondents are reacting rationally to the content of the Defendants' product packaging. I, as the consumer survey expert, did not determine and am not responsible for the content on the Defendants' product packaging which most consumers interpret as communicating that the Products are safe for use by babies. By accusing my survey of "creating 'evidence' of various consumer preferences and perceptions that in reality, do not exist," Dr. Kivetz's misses the obvious – the Defendants' packaging is communicating to the reasonable consumer that the Products are safe for use by babies.

48.    The word "Sleeper" unavoidably communicates in the English language that the product is intended to be used for sleeping, which furthermore communicates that the product is *safe* for sleeping. A reasonable consumer does not interpret a "Sleeper" product for babies to be *unsafe* for babies. It is inaccurate and without justification to criticize my survey as leading and biased when the fact is that the product packaging tested in my survey communicates to a reasonable consumer that the product is safe for use by babies, as my survey results have shown.

49.    Dr. Kivetz's criticism of my use of closed-ended survey questions is without foundation. Dr. Kivetz's criticisms are contradicted by nearly all professional survey research experts who recognize that closed-ended questions are more appropriate for scientifically rigorous, quantitative survey research, while open-ended survey questions have more utility for qualitative research.[5]

---

[5] *See* "As a general rule survey researchers prefer closed questions because they are easier to process and reduce coder variability." Bradburn, N. M., Sudman, S., & Wansink, B. 2004. *Asking Questions: A Practical Guide to Questionnaire Design*, p. 167. Schuman, H. & Presser, S. 1981. Questions and Answers in Attitude Surveys, New York: Academic Press. Schuman and Presser refer to the "triumph of closed questions" over open-ended questions, p. 79. Schuman and Presser

50.     There are certain disadvantages in open-ended questions and corresponding advantages in closed-ended questions that informed my decision to use closed-ended survey questions. My decisions to use open-ended and closed-ended questions are based on my expertise in the relative advantages and disadvantages of both types of survey questions. I also consider the intended purposes of the collected information as a factor in making my decisions about question format.

51.     I relied on closed-ended questions that are common and standard by survey researchers attempting to derive statistical estimates of population characteristics, such as the percentage of class members that perceived the Products to be safe for use by babies.

52.     Dr. Kivetz's preferred approach – the use of open-ended survey questions – is not a reliable question format for collecting information for quantifying the percentage of consumers who perceived the Products to be communicating that the products are safe for use by babies.[6] Below I make the argument why the survey research industry prefers closed-ended survey questions over open-ended survey questions for quantitative research, especially in the context of self-administered online surveys for which an actual professional interviewer cannot probe respondents to clarify their responses to open-ended questions.

53.     The hallmark of open-ended questions is that respondents must be sufficiently motivated, literate, and expressive to comply with the survey's request to articulate their thoughts in writing. Respondents vary significantly on these three dimensions, leading to uneven accuracy

---

summarize the results of their experiment using closed versus open-ended questions as follows in an experiment where interviewers probed respondents to clarify their responses to open-ended questions: "[W]e think the closed form of the question is superior because it separates types of responses that were often indistinguishable in the open coding…. Whatever the advantages of the open question for assessing salience and for avoiding social desirability effects—and we have been unable to discover firm evidence that either of these advantages actually occurs—there seem to be even greater disadvantages arising from vagueness of expression by respondents, frequent failures to probe adequately by interviewers, and occasional misunderstanding by coders. All this is avoided in closed questions, where respondents are in essence asked to code themselves, with minimal intervention by third parties," p. 104. Schuman and Presser's experiment used professional interviewers to administer the surveys, as opposed to the kind of self-administered survey standardly conducted online in recent decades. With professional interviewers, the respondents providing vague or incomplete responses to open-ended survey questions can be probed and asked to clarify their responses.

[6] If respondents do answer an open-ended question, they may provide only a short response or a response that does not actually answer the question. Dillman, Don A., et al. 2014. Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method, 4th Edition. at 208-209.

and depth in responses. Respondents lacking in motivation (*e.g.*, because the respondent is not actually in a purchase environment), literacy, or expressiveness in written language are predictably less likely to provide responses useful for analysis, which results in *underestimation* of the study's measures.[7]  In answering an open-ended question, respondents might be unmotivated or unable to articulate what they understand the product packaging to mean to them or to appreciate whether or not their purchase decisions were influenced by the product packaging. In contrast, respondents answering well-constructed, closed-ended survey questions are not required to muster significant motivation or be comfortable with writing responses in order to comply with the survey task.

54.    By their very nature, open-ended questions produce text entries typed in by the respondents. Because the text-based responses are not useful on their own for analysis, the researcher must develop coding schemes to categorize the text-based responses into categories. The process of developing the coding schemes and then actually coding the text-based responses can be easily criticized as a subjective exercise that can introduce bias.[8]

55.    In contrast, respondents answering closed-ended questions provide unambiguous selections that require no further interpretation by the researcher in order to be useful for quantitative analysis.

56.    Finally, open-ended questions can provide biased responses because lesser-

---

[7] Non-response bias (that is, the bias in data when the responders and non-responders are different on the population characteristics being measured) can happen from open-ended surveys because of chronic non-response to the open-ended questions. Borg, I. 2005, Who writes what kinds of comments? Some new findings, in A. I. Kraut (Chair), Grappling with write-in comments in a web-enabled survey world, Symposium conducted at the 20th annual conference of the Society for Industrial and Organizational Psychology, Los Angeles, California; Poncheri, R. M., Lindberg, J. T., Thompson, L. F., & Surface, E. A. 2008, A comment on employee surveys: Negativity bias in open-ended responses, Organizational Research Methods, 11, 614-630. Bias from open-ended survey questions can also happen from a tendency for respondents with more negative attitudes to be more likely to respond to open-ended survey questions, while more satisfied respondents are less likely to take the effort to respond to open-ended survey questions. McNeely, R. L. 1990, Do respondents who pen comments onto mail surveys differ from other respondents? A research note on the human services job satisfaction literature, Journal of Sociology & Social Welfare, 17(4), 127-137; *see also* Bernard C.K. Choi and Anita W.P. Pak, January 2005, Preventing Chronic Disease. 2(1): A13. A Catalog of Biases in Questionnaires "Open-ended questions can result in data with differential quality. Also, respondents are likely to be unwilling to take the time to answer them."

[8] Mistakes in coding answers to open-ended questions is endemic. *See* Arthur Lupia, Challenges and Opportunities in Open-Ended Coding. Available at https://iriss.stanford.edu/sites/default/files/lupia_slides.pdf.

educated or less literate subpopulations are less likely to answer them or answer them with the bare minimum of completeness to permit coding of the responses.[9]

57.    Dr. Kivetz also criticized me for having an "incomplete" and "biased" list of response options for my consumer perception questions (Kivetz Rebuttal Report, ¶ 87, ¶ 101) by providing two substantive response options and a "Don't know/ not sure" response option. This is part of Dr. Kivetz's argument that I should have used an open-ended survey question to capture the full range of respondents' interpretations of the challenged claim, rather than by providing a list of response options. But, as I have demonstrated, open-ended questions are a less reliable question format for quantitative studies.

58.    Reply to Dr. Kivetz's criticism that my consumer perception survey failed to include any filter questions prior to my perception questions. With respect to Dr. Kivetz's contention that I did not control for respondents that were guessing in the survey (Dr. Kivetz Report, ¶¶ 90), the fact is that I included quality control checks in the survey that specifically addressed the need to identify respondents that were guessing or those who otherwise would have provided "noisy" responses. I documented those steps in my expert report of October 12, 2021 (Attachment B). Such respondents were identified in the initial screening section of the survey and not allowed to proceed further in the survey. The quality control checks involved: (i) removing respondents that entered age and gender information that did not match with their previously recorded response; (ii) removing respondents that failed to comply with the reCAPTCHA test; (iii) removing respondents that were unable to confirm their understanding of the survey topic; and (iv) removing respondents that did not promise to provide honest answers to the survey questions and removing those failing to promise that they would not guess in answering the survey questions.

59.    Reply to Dr. Kivetz's criticism that my consumer perception questions were extremely leading, repetitive, and focused respondents on the Plaintiffs' hypotheses while omitting options consistent with Fisher-Price's Position. Dr. Kivetz complains that I did not measure consumer perceptions that are consistent with Fisher-Price's positions, such as perceptions related to the use of the Products unrelated to sleep (Kivetz Rebuttal Report, ¶ 97). In response, I do not apologize for not testing the Defendants' positions. I explained in my October 12, 2021 declaration that my assignment was to test the Plaintiffs' theory of liability through designing and conducting

---

[9] Dillman, Don A., et al. 2014. Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method, 4th Edition. Wiley; Schuman, H. & Presser, S. 1981. Questions and Answers in Attitude Surveys, New York: Academic Press.

a reliable consumer survey. Dr. Kivetz could have tested the Defendants' positions with respect to consumer perceptions in the survey he designed and conducted. Instead, he conducted a survey using an experimental design that did not measure whatsoever any consumer perceptions of the Products' packaging.

60.    Dr. Kivetz fails to note that I included in my consumer perceptions survey two measurements unrelated to safety and health. I included these measurements to prevent respondents from having the very focalism bias that concerns Dr. Kivetz. The two measurements concerned the perceptions about the product being "made with high quality materials" and the product being "portable."

61.    Dr. Kivetz also fails to note the care with which that I positioned the response options as balanced and equal in legitimacy. In so doing, I am drawing on survey research best practice on topics that could be vulnerable to over-statements of behaviors, such as voting or attendance of religious services. Before my consumer perception questions, I established a context of balance and neutrality by establishing that it is equally acceptable to perceive that the packaging conveys certain meanings or does not convey certain meanings, as shown below:

> Next, we want to know what you understand the product packaging to be communicating.

> We will show you some possible ways that people might or might not understand the meaning of the words on the packaging.

> We want you to tell us whether you think the packaging is communicating that meaning or whether you think the packaging is not communicating that meaning.

62.    Dr. Kivetz's other criticisms bear on my use of closed-ended survey questions, which, as I have argued, are the industry standard for quantitative studies.

63.    <u>Reply to Dr. Kivetz's criticism that my consumer perception questions suffered from severe "yea-saying" and order biases.</u> Dr. Kivetz's criticisms about the potential for "Yea-saying" bias have relevance in interviewer-administered surveys (such as by telephone or in-person interviewing) where the respondent potentially has the motivation to "acquiesce" and provide socially desirable, agreeable answers. I did not conduct such a survey. I conducted an online, self-administered survey without any interviewer administration of the survey. In forming his critique, Dr. Kivetz relies on Professor Diamond's "Reference Guide," whose guidelines were established when interviewer-administered surveys were the standard (pre-dating online surveys).

64.    Dr. Kivetz argues that my survey design contributes to a "demand bias in the Plaintiffs' favor" because of the "'yea-saying" tendency to agree when they [respondents] do not have an opinion." (Kivetz Rebuttal Report, ¶ 103). Dr. Kivetz overlooks the fact that I gave respondents the option to state a non-opinion by selecting the "Don't know / not sure" response option. My respondents not only were taking the survey online (and therefore had no social pressure to "acquiesce") but also had the option to state that they did not have an opinion. I fully anticipated the potential error that could have been introduced by limiting respondents to only two substantive response options.

65.    Reply to Dr. Kivetz's criticisms that my consumer perception questions were vague and confusing, thereby increasing guessing behavior and survey noise. Dr. Kivetz's criticism is internally contradictory. If my respondents were guessing, the results would have shown 50/50 splits in the survey data for the consumer perception questions. The fact is that, on average, 81.1% (not 50%) of the respondents answered that the product packaging was communicating a specific meaning. There is no evidence that my respondents thought the consumer perception questions were vague or confusing, or that the respondents were guessing. I provide a screen capture below of one of my consumer perceptions questions as evidence of the simplicity and directness of my consumer perception questions.

Based on the product packaging, do you believe the packaging is or is not communicating this meaning?

**The product is designed to be used for babies.**

Please select one.

○ The packaging is communicating this

○ The packaging is not communicating this

○ Don't know / not sure

66.    Reply to Dr. Kivetz's criticisms that my materiality survey questions were extremely leading and created severe demand effects and focalism. The five-point purchase intention Likert scale that I used for my materiality survey questions has been for decades one of

the most commonly used survey constructs in market research.[10] There is no evidence that my materiality questions were leading or produced other biases.

67.     <u>Reply to Dr. Kivetz's criticisms that my consumer survey violated marketplace conditions by presenting truncated, distorted stimuli and by artificially focusing consumers on the disputed products.</u> Dr. Kivetz complains that I did not show the respondents the complete product packaging. The fact is that I showed the front and back panels of the packaging to the respondents and the other panels that communicated the alleged misrepresentations. I designed the survey to be optimized for an online survey where many respondents would be completing the survey using their smartphones having small screens. I deliberately showed the product packaging in separate panel pictures to help the respondent see the content of the product packaging on their devices, rather than following Dr. Kivetz's approach which is not optimized for online survey administration.

68.     <u>Reply to Dr. Kivetz's criticisms that my consumer survey failed to include any survey controls.</u> In the context of this litigation, Dr. Kivetz's argument is that, without a control group, we cannot trust a consumer survey finding that most consumers perceive the packaging to communicate safe-for-use messages, even though the packaging itself has the word "Sleeper" as the noun in the product name, as shown below, and explicitly states the product is for the baby to sleep in "all night long," again shown below.

---

[10] Burns, Alvin and Burns, Ronald. 2008. <u>Basic Marketing Research</u> (Second ed.). New Jersey: Pearson Education, p. 245.

69. Implausibly, Dr. Kivetz is arguing that there could be so much "noise" in the survey responses that, in reality, most consumers do not perceive the Products to be communicating safety messages. By exaggerating the potential impact of "noise" on survey results, Defendants' experts can then justify the use of test-control experimental methodologies that have the predictable consequence of producing data indicating that consumers are not sensitive to the harmful act(s) alleged by Plaintiffs. These same experts then downplay or ignore entirely the introduction of error by using a test-control group design that does nothing to check the influence of irrelevant pre-existing beliefs, preferences, and brand loyalties (that consumers have for branded products).

70. I deliberately avoided Dr. Kivetz's preferred methodology, which is based on using open-ended survey questions and a test-control group design, because in my expert opinion these methodologies would result in unreliable data for the Court.

## CONCLUSION

71. The Kivetz Rebuttal Report has not undermined or otherwise affected my confidence in the reliability or validity of my consumer survey. I conclude that the reasonable consumer was in fact misled by Defendants' labelling practices, as indicated by a substantial majority of my respondents understanding the Defendants' packaging to convey meanings consistent with the Plaintiffs' allegations. (Defendants did not collect any data to contradict my findings.) Large majorities of consumers in my survey perceived the Defendants' product packaging to communicate that the products were safe for babies, that they were intended to be used for sleeping and napping, and that they would not hurt the babies. Furthermore, my consumer survey established that these consumer perceptions are material to consumers' purchasing

decisions. Finally, my survey found that a simple warning disclaimer on the products packaging would cause a substantial decrease in consumers' interest in purchasing the products.

72.    The facts and data that I considered for developing the surveys and my opinions in this report are cited herein and in my October 12, 2021 expert report. I reserve the right to modify my opinions if I were to be provided additional information, and to supplement them, if necessary, to respond to criticisms or objections from the opposing party.

_____

Executed in E. Palo Alto, California on January 13, 2022.

_____

J. MICHAEL DENNIS, PH. D

DATED: January 13, 2022_____

# J. MICHAEL DENNIS

Phone: (650) 288-1930                                          274 Redwood Shores Parkway, #529
JMDSTAT@gmail.com                                             Redwood City, CA 94065

Education
| | | | |
|---|---|---|---|
| University of Texas, Austin | Government | B.A. | 1984 |
| University of Texas, Austin | Government | M.A. | 1986 |
| University of Chicago | Political Science | Ph.D. | 1992 |

Employment
| | |
|---|---|
| 2015-Present | Senior Vice President, NORC |
| 2014-Present | President and Owner, JMDSTAT Consulting Inc. |
| 2012-2014 | Managing Director, GfK Custom Research LLC (GfK acquired Knowledge Networks in January 2012) |
| 2009-2011 | Executive Vice President, Knowledge Networks |
| 2007- 2008 | Senior Vice President, Knowledge Networks, Inc |
| 2001-2006 | Vice President and Managing Director, Knowledge Networks, Inc |
| 2000-2001 | Vice President of Operations and Survey Research, Knowledge Networks, Inc. |
| 1999-2000 | Senior Scientist, Abt Associates Inc. |
| 1998-1999 | Senior Survey Director, Abt Associates Inc. |
| 1992-1998 | Survey Director, Abt Associates Inc |
| 1989-1992 | Research Assistant, Political Science Department, University of Chicago |

Notable Past Projects

- 2020 Facebook Election Research Project, 2020-Present, NORC Director. Funded by Facebook Technologies, NORC's study director a national study examining the impact of social media on U.S. politics, democratic institutions, and elections.
- America in One Room (A1R), 2019, NORC Director. Funded by Helena Project and conducted under the supervision of Professors James Fishkin and Larry Diamond from the Center for Deliberative Democracy at Stanford University.
- Time-Sharing Experiments for the Social Sciences (TESS), 2016-2020, Co-Investigator, Funded by the National Science Foundation (Award No. 1628057). NORC's study director for approximately 140 hundred social science experiments funded by the TESS program.
- Demonstration of a Feasibility of Improving Scientific Literacy and Lifelong Learning through a Just-in-Time Dissemination Process, 2016-Present, Co-Investigator, Funded by National Aeronautics and Space Administration (NASA), (Grant No. F041712). NORC's director of the five-year survey project funded by NASA in collaboration with researchers from the Institute for Social Research, University of Michigan.
- GenForward Panel, 2016-Present. NORC Director, funded by John D. & Catherine T. MacArthur Foundation. NORC's study director for the University of Chicago polling panel of young adults in collaboration with the Black Youth Project and the Associated Press-NORC Center for Public Affairs Research.
- Connecting Health and Technology, 2013-2014, GfK Director, Funded by the American Legacy Foundation. GfK's Study Director responsible for the survey design and management of a custom panel study of 10,000 U.S. teens and young adults measuring the effectiveness of the Legacy "Truth" smoking prevention media campaign.
- Google Screenwise Research Panel 2011-2014, Director. Knowledge Networks' and later GfK's study director responsible for the design and implementation of a new custom panel of broadband households measuring how consumers use the internet.
- Time-Sharing Experiments for the Social Sciences (TESS), 2012-2016, Co-Investigator, Funded by the National Science Foundation (Award No. 1227179). Knowledge Networks/GfK's study director for more than two hundred social science experiments funded by the TESS program.

1

- American National Elections Studies 2007-2009 Panel Study, Knowledge Networks Principal Investigator, Funded by the National Science Foundation.   The Knowledge Networks study director responsible for sampling, data collection methodology, and project management for a longitudinal study of approximately 2,500 households during the historic 2008 Presidential election.
- National Annenberg Election Survey 2007-2009, Knowledge Networks Director, Annenberg Public Policy Center, University of Pennsylvania.  The Knowledge Networks study director responsible for project management for large-scale tracking study (20K interviews per wave) of the U.S. electorate during the historic 2008 Presidential election.
- National Immunization Survey, Abt Associates Data Collection Director, 1997-2000, Funded by the U.S. Centers for Disease Control and Prevention.  Responsible for the data collection for the U.S. Federal government's largest random digit dialing telephone survey with approximately 1M households contacted each year.
- Project Network (First Followup), Abt Associates Project Director, Funded by the U.S. Social Security Administration.  Led the project management team for this in-person field study.
- Estimation of the Number of Hard Core Drug Users in the U.S., Office of National Drug Control Policy
- Access to Kidney Transplantation, Agency for Health Care Policy and Research.   Led the survey project management team for this in-person field study testing an experimental method for estimating hard core drug use.
- A Case Control Study of Stomach Cancer in Poland and Polish Americans, National Cancer Institute
- The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short Term General Hospitals and the Impact of Abuse and Dependence on Hospital Utilization, Charges and Costs, National Institute of Alcohol Abuse and Alcoholism

Expert Witness Testimony in Litigation in the Last 4 Years

1. January 19, 2018.  Expert Deposition. Williams-Sonoma Song-Beverly Act Cases.  Superior Court of the State of California, County of San Francisco.
2. April 13, 2018.  Expert Deposition. Fitzhenry-Russell, et al. v. Dr. Pepper Snapple Group, Inc., Dr Pepper/Seven Up, Inc., and Does 1-50, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated). United States District Court, Northern District of California.
3. June 22, 2018.  Expert Deposition. Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.  Case No. 5:17-cv-01027-BLF. United States District Court, Northern District of California, San Jose Division.
4. August 21, 2018. Expert Deposition. Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.  United States District Court, Southern District of New York. 16 Civ. 8364 (RA) (AJP).
5. September 5, 2018. Expert Deposition. Suzanna Bowling et al. v. Johnson & Johnson and McNeil Nutritionals, LLC.  U.S. District Court, Southern District of New York. Case No. 1:17-cv-03982.
6. September 10, 2018. Expert Deposition.  Dzielak et al. v. Whirlpool. U.S. District Court, District of New Jersey.  Civil Action No. 2:12-cv-00089-KM-JBC. .
7. October 26, 2018. Expert Deposition. Ryan Porter and Haarin Kwon v. NBTY, Inc., United States Nutrition, Inc., Healthwatchers (DE), Inc., et al. U.S. District Court, Northern District of Illinois. Civil Action No. 15-cv-11459.
8. October 30, 2018. Expert Deposition. Browning and Basile et al. v. Unilever United States, Inc. U.S. District Court, Central California. Case No. 8:16-CV-2210-AG-KES.
9. February 14, 2019.  Expert Deposition. Erin Allen et al. v. Conagra Foods Inc. U.S. District Court, Northern District of California, Case No. 3:13-CV-01279-VC.
10. June 21, 2019. Expert Deposition. Joseph Gregorio, et al. v The Clorox Company. U.S. District Court, Northern District of California. Case No. 4:17-cv-03824-PJH.
11. October 3, 2019. Expert Deposition. Patrick McMorrow et al. v. Mondelez International, Inc. U.S. District Court, Southern District of California. Case No. 3:17-cv-2327-BAS-JLB.
12. November 9, 2019. Expert Deposition. Buckeye Tree Lodge and Sequoia Village Inn, LLC, et al. v. Expedia, Inc. U.S. District Court, Northern District of California. Case No. 16:cv-04721-VC.
13. December 17, 2019. Expert Deposition. Camille Cabrera v. Bayer Healthcare LLC and Bayer Corp., U.S. District Court for the Central District of California (Case No. 2:17-cv-08525).

2

14. January 16, 2020. Expert Deposition. In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices and Products Liability Litigation. U.S. District Court for the District of New Mexico (Case No. 1:16-md-02695-JB-LF).

15. April 6, 2020. Expert Deposition. Pardini v. Unilever. U.S. District Court for the Northern District of California (Case No. Case No. CV13-1675 SC).

16. May 27, 2020. Expert Deposition. Patrick McMorrow et al. v. Mondelez International, Inc. U.S. District Court, Southern District of California. Case No. 3:17-cv-2327-BAS-JLB.

17. December 30, 2020. Expert Deposition. Michael Maeda et al. v. Kennedy Endeavors, Inc. U.S. District Court, District of Hawaii. Case No. 1:18-CV-00459-JAO-WRP.

18. January 19, 2021. Expert Deposition. Shelly Benson et al. v. Newell Brands, Inc. and NUK USA LLC. U.S. District Court, Northern District of Illinois. Civil Action No. 19-cv-06836.

19. February 26, 2021. Expert Deposition. Sharon Willis et al. v. Colgate-Palmolive Co. U.S. District Court, Central District of California. Civil Action 2:19-CV-08542-JGB-RAO.

20. March 15, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) Civil Action No. 19-cv-00768 (BMC).

21. July 1, 2021. Expert Deposition. Sharpe et al. v. GT's Living Foods, LLC. U.S. District Court, Central District of California. Civil Action 2:19-CV-10920-FMO-GJS.

22. July 12, 2021. Expert Deposition. Vizcarra et al. v. Unilever United States, Inc. U.S. District Court for the Northern District of California (Case No. 4:20-cv-02777-YGR).

23. August 23, 2021. Expert Deposition. State of New Mexico v. Solvay Pharmaceuticals, Inc., Abbott Products, Inc., Abbott Laboratories, Abbvie Inc. State of New Mexico, County of Santa Fe (Case No. D-101-CV-2019-01897).

24. August 24, 2021. Expert Deposition. Minor et al. v. Baker Mills, Inc. and Kodiak Cakes, LLC. U.S. District Court for the Northern District of California (Case No. 20-cv-02901-RS).

25. September 20, 2021. Expert Deposition. Senne et al. v. Office of the Commissioner of Baseball, et al. U.S. District Court for the Northern District of California (Case No. 3:2014-cv-00608).

26. October 8, 2021. Expert Deposition. Fishon et al. v. Peloton Interactive, Inc. United States District Court, Southern District of New York (Case No. 1:19-CV-11711-LJL).

27. October 25, 2021. Expert Deposition. IN RE KIND LLC "Healthy and All Natural" Litigation. United States District Court, Southern District of New York (15-MD-2645 (WHP)).

28. October 26, 2021. Expert Deposition. IN RE: FCA US LLC Monostable Electronic Gearshift Litigation. United States District Court, Eastern District of Michigan Southern Division (Case No. 16-md-02744).

29. November 4, 2021. Expert Deposition.  IN RE: FISHER-PRICE ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION, United States District Court, Western District of New York (Case No. 1:19-md-2903).

30. November 29, 2021. Expert Deposition. Sharpe et al. v. A & W Concentrate Company and Keurig Dr. Pepper Inc. (E.D.N.Y.) Civil Action No. 19-cv-00768 (BMC).


Dissertation

"The Politics of Kidney Transplantation," Department of Political Science, University of Chicago, June 1992.  Chair:  Professor Jon Elster.  Published at https://sites.google.com/site/jmichaeldennis/home.

Publications

Michaels, Stuart, Vicki Pineau, Becky Reimer, Nadarajasundaram Ganesh, and J. Michael Dennis. 2019. Test of a Hybrid Method of Sampling the LGBT Population: Web Respondent Driven Sampling with Seeds from a Probability Sample. Journal of Official Statistics 35(4):731-752.

Cantrell J, Hair E. C., Smith, A., Bennett M., Rath, J.M., Thomas, R.K., Fahimi, M., Dennis, J.M., and Vallone, D. 2018. Recruiting and Retaining Youth and Young Adults: Challenges and Opportunities in Survey Research for Tobacco Control. Tobacco Control 27(2).

Josh Pasek, S. Mo Jang, Curtiss L. Cobb III, J. Michael Dennis, and Charles DiSogra. 2015.  Can Marketing Data Aid Survey Research? Examining Accuracy and Completeness in Consumer-File Data. Public Opinion Quarterly.  78 (4): 889-916.

Baker, Reginald, Stephen J. Blumberg, J. Michael Brick, et al. 2010. AAPOR Report on Online Panels. Public Opinion Quarterly 74(4):711-781.

Sanders, Alan R., Douglas F. Levinson, Jubao Duan, et al. 2010. The Internet-based MGS2 Control Sample: Self Report of Mental Illness. American Journal of Psychiatry 167(7) 854-865.

Timothy Heeren, Erika M. Edwards, J. Michael Dennis, Sergei Rodkin, Ralph W. Hingson, and David L. Rosenbloom.  2008. "A Comparison of Results from an Alcohol Survey of a Pre-recruited Internet Panel and The National Epidemiological Survey on Alcohol and Related Conditions."  Alcoholism: Clinical and Experimental Research  32(2): 1-8.

J. Michael Dennis and Rick Li.  2007.  More Honest Answers to Surveys? A Study of Data Collection Mode Effects. Journal of Online Research 10(7):1-15.

Tom W. Smith and J. Michael Dennis. 2005. "Online versus In-Person: Experiments with Mode, Format, and Question Wordings." Public Opinion Pros, December.  Available at www.publicopinionpros.com/from_field/2005/dec/smithkn.asp.

Etzel Cardeña, J. Michael Dennis, Mark Winkel, and Linda J. Skitka. 2005. "A Snapshot of Terror: Acute Posttraumatic Responses to the September 11 Attack."  Journal of Post-Traumatic Stress 6(2):69-84.

William E. Schlenger, Juesta M. Caddell, Lori Ebert, B. Kathleen Jordan, Kathryn M. Rourke, David Wilson, Lisa Thalji, J. Michael Dennis, John A. Fairbank,  Richard A. Kulka. 2002.  "Psychological Reactions to Terrorist Attacks:  Findings from the National Study of Americans' Reactions to September 11." Journal of the American Medical Association, 288(5): 1235-1244.

J. Michael Dennis. 2001. "Are Internet Panels Creating Professional Respondents?"  Marketing Research Summer: 484-488.

J. Michael Dennis, Martin Frankel, Nancy A. Mathiowetz, Candice Saulsberry, Philip J. Smith, K.P. Srinath, Ann-Sofi Rodén, and Robert A. Wright. 1999. "Analysis of RDD Interviews by the Number of Call Attempts: The National Immunization Survey."  Proceedings of the Section on Survey Research Methods, American Statistical Association.

J. Michael Dennis, Victor G. Coronado, Martin Frankel, Ann-Sofi Rodén, Candice Saulsberry, Howard Speizer, and Robert A. Wright. 1998. "The Use of an Intranet to Manage a Telephone Survey." Proceedings of the Section on Survey Research Methods, American Statistical Association.

Paul Buckley, J. Michael Dennis, Candice Saulsberry, Victor G. Coronado, Trena Ezzati-Rice, Edmond Maes, Ann-Sofi Rodén, and Robert A. Wright. 1998. "Managing 78 Simultaneous RDD Samples."  Proceedings of the Section on Survey Research Methods, American Statistical Association.

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Effects of New York State's Ban on Multiple Listing for Cadaveric Kidney Transplantation." Health Services Research 33 (June, 1998).

Alan J. White, Ronald J. Ozminkowski, Andrea Hassol, J. Michael Dennis, and Michael Murphy. "The Relationship Between Multiple Listing and Cadaveric Kidney Transplantation and the Effects of a Multiple Listing Ban." Transplantation Reviews, II (April 1997): 76-84.

J. Michael Dennis, Ph.D. "Scarce Medical Resources: Hemodialysis and Kidney Transplantation," in Jon Elster, ed., Local Justice in America, New York, NY: Russell Sage Foundation, 1995.

J. Michael Dennis, Patricia Hanson, Ernest E. Hodge, Ruud A.F. Krom, Robert M. Veatch, "An Evaluation of the Ethics of Presumed Consent and a Proposal Based on Required Response," UNOS Update 10 (February, 1994): 10-15-18.

J. Michael Dennis.  "Surgeons Under Surveillance:  Dialysis and Transplantation in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

J. Michael Dennis.  "The Colour of Genes in the U.S.," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

J. Michael Dennis.  "Three Countries, Three Systems," in Jon Elster and Nicolas Herpin, eds., The Ethics of Medical Choice, London:  Pinter, 1994.

Michael P. Battaglia, Mary Cay Burich, J. Michael Dennis, Marcia Russell, Hal Yahoo, Page Chapel, "The Prevalence of Alcohol and Other Drug Abuse and Dependence in Short-Term General Hospitals," 1993 Proceedings of the International Conference on Establishment Surveys, American Statistical Association (1993): 569-572.

J. Michael Dennis. "Government Regulations 'Politicizing' Transplantation," Nephrology News & Issues 6 (September 1992): 48.

J. Michael Dennis. "A Review of Centralized-Rule Making in American Transplantation," Transplantation Reviews 6 (April 1992): 130-137.

Selected Papers

Dennis, J. Michael, John Dombrowski, Kathleen Hall Jamieson, Josh Pasek and Kenneth Winneg. Disentangling Mode Effects and Mode Differences in Recruitment: Randomizing Survey Mode at the Margins and Testing Discontinuities. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Bilgen, Ipek, J. Michael Dennis, Nada Ganesh, Edward Mulrow, Vicki Pineau, Mark Watts and Michael Yang. Estimation Methods for Combining Probability and Nonprobability Samples. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Stephanie Jwo, Rosalind Koff, Stuart Michaels, Vicki Pineau and Becky Reimer. Comparing Two RDS Approaches to Extend the Reach of a Probability-Based Panel. Presented at the 2019 Annual Meeting of the American Association for Public Opinion Research..

J. Michael Dennis.  Panel-based Probability Alternatives for Sampling Racial and Ethnic Minorities. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Nada Ganesh. Examination of Nonresponse Follow-up (NRFU) Impact on AmeriSpeak Panel Data Quality and Study Estimates. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

David Sterrett, Dan Malato, Jennifer Benz, Ipek Bilgen, J. Michael Dennis, and Vicki Pineau. Exploring the Methodological Tradeoffs of Mixed-Mode Surveys with an Experimental Design.   Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Ipek Bilgen, J. Michael Dennis, and Tom Smith.  Comparing the Probability-Based AmeriSpeak Panel and the In-Person 2016 General Social Survey: Mode, Device, Item Wording Experiments. Presented at the 2018 Annual Meeting of the American Association for Public Opinion Research.

Nadarajasundaram Ganesh, Vicki Pineau, J. Michael Dennis. 2017. Managing Respondent Burden for a Household Panel using Permanent Random Number Sampling.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, J. Michael Dennis, Stuart Michaels, Sherry Emery, Nadarajasundaram Ganesh. 2017. Surveying Rare or Hidden Populations Using a Probability-based Household Panel. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Pineau, Vicki, Paul J. Lavrakas, and J. Michael Dennis.  2017.  Deploying a Total Survey Error (TSE) and Total Survey Quality (TSQ) Assessment of the AmeriSpeak® Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Reimer, Becky, Jennifer Benz, Trevor Tompson, Liz Kantor, Rosalind Koff, J. Michael Dennis, Emily Swanson, David Pace, 2017. Testing A New Methodology for Exit Polling: A National, Panel-based Experiment. Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Malato, Dan, Jennifer Benz, Trevor Tompson, J. Michael Dennis, Vicki Pineau, Nadarajasundaram Ganesh.  2017. Impact of Mixed-Mode Recruitment and Data Collection on Sample Representativeness and Survey Estimates for a Probability-based Household Panel.  Presented at the 2017 Annual Meeting of the American Association for Public Opinion Research.

Barron, Martin and J. Michael Dennis. 2016. Multi-Client Household Panel Quality:  The Case of AmeriSpeak." Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Ganesh, N., J. Michel Dennis, and Paul J. Lavrakas. 2016.  Using Nonresponse Follow-up Recruitment to Help Build a Probability-based Research Panel.  Presented at the 2016 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Angela Fontes, Kean Chew, Paul J. Lavrakas, Nada Ganesh. 2015. "Boosting Probability-Based Web Survey Response Rates via Nonresponse Follow-Up." Presented at the 2015 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Kathleen Connolley, and Stephanie Jwo.  "Online Survey Sampling Solutions for Studies of LGB."  Presented at the 2013 Chicago Annual Workshop on Biomeasures Collection in Population-Based Health and Aging Research hosted by the Chicago Core on Biomeasures in Population-Based Health and Aging Research (CCBAR), October 17, 2013.

Dennis, J. Michael, Curtiss Cobb III.  "How Far Have We Come? The Lingering Digital Divide and Its Impact on the Representativeness of Internet Surveys."  Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Dennis, J. Michael, Curtiss Cobb III, Michael Lawrence, and Jordon Peugh. "The Prevalence and Impact of Self-Selection Bias and Panel Conditioning on Smoker Studies Using Established Internet Panels." Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.

Pasek, Josh, J. Michael Dennis, and Curtiss Cobb III. "Consumer File Ancillary Data and Nonresponse Adjustment: Assessing the Consistency of Estimates Across Weighting Strategies."  Presented at the 2013 Annual Meeting of the American Association for Public Opinion Research.  Submitted for publication.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. "Can Microtargeting Improve Survey Sampling?  An Assessment of Accuracy and Bias in Consumer File Marketing Data." Presented at the 2012 Annual Meeting of the American Political Science Association.

Disogra, Charles. J. Michael Dennis and Mansour Fahimi. 2012 "Using Ancillary Information in National ABS Samples to Recruit Hard-to-Reach Young Adults and Hispanics." Presented at the 2012 Hard to Reach Conference sponsored by the American Statistical Association.

6

Lavrakas, Paul J. J. Michael Dennis, Jordan Peugh, Jeffrey Shand-Lubbers, Elissa Lee, Owen Charlebois and Mike Murakami. 2012 "An Experimental Investigation of the Effects of Noncontingent and Contingent Incentives in Recruiting a Long-Term Panel: Testing a Leverage Salience Theory Hypothesis." Presented at the 2012 Midwest Association for Public Opinion Research.

Pasek, Josh. Seung Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012 "How Accurate is Micro-Targeting? An Assessment of Marketing Data Bias for Political and Survey Purposes." Presented at the 2012Annual Conference of the American Association for Public Opinion Research and the 2012 Annual Conference of the American Political Science Association.

Dennis, J. Michael. Charles DiSogra and Erlina Hendarwan. 2012. "Using Ancillary Information to Stratify and Target Young Adults and Hispanics in National ABS Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research and the 2012 Hard to Reach Conference.

Pasek, Josh. S. Mo Jang, Curtiss Cobb, Charles DiSogra and J. Michael Dennis. 2012. "The Public According to Marketers: Imputing National Demographics From Marketing Data Linked to Address-Based Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Shand-Lubbers, Jeff. J. Michael Dennis, Jordon Peugh, Liz Brisson and Zabe Bent. 2012 "The Use of Online Methodology to Inform Public Policy Planning: A Case Study from San Francisco." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Investigating Non-response Bias in a Non-response Bias Study." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Lavrakas, Paul. J. Michael Dennis, Jordon Peugh, Jeff Shand-Lubbers, Elissa Lee and Owen Charlebois. 2012. "Experimenting with Non-contingent and Contingent Incentives in a Media Measurement Panel." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

DiSogra, Charles. Curtiss Cobb, Elisa Chan, and J. Michael Dennis. 2012 "Using Probability-Based Online Samples to Calibrate Non-Probability Opt-in Samples." Presented at the 2012 Annual Conference of the American Association for Public Opinion Research.

Dennis, J. Michael. Yelena Kruse, and Trevor Tompson. 2011. "Examination of Panel Conditioning Effects in a Web-Based 2007-2008 Election Study." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research.

Zukin, Cliff, Jessica Godofsky, Carl Van Horn, Wendy Mansfield, and J. M. Dennis. 2011. "Can a Non-Probability Sample Ever be Useful for Representing a Population? Comparing Probability and Non-Probability Samples of Recent College Graduates." Presented at the 2011 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/docs/aapor2011/aapor11-can-a-non-probability-sample.pdf

Baker, Reg. Stephen Blumberg, J. Michael Brick, Mick P. Couper, Melanie Courtright, J. Michael Dennis, Don Dillman, Martin R. Frankel, Philip Garland, Robert M. Groves, Courtney Kenned, Jon Krosnick, Sunghee Lee, Paul J. Lavrakas, Michael Link, Linda Piekarski, Kumar Rao, Douglas Rivers, Randall K. Thomas, and Dan Zahs. 2010 "AAPOR Report on Online Panels." The Final Report of the AAPOR Online Panel Task Force. Prepared for the American Association for Public Opinion Research, March, 2010.

Dennis, J. Michael, "Using Ancillary Data Available for Address-Based Sampling to Measure Self-Selection Bias" Paper presented to the International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys, Chicago, June, 2011.

7

Dennis, J. Michael, Jordon Peugh, and Pat Graham. 2010. "KnowledgePanel Calibration: Using KnowledgePanel to Improve the Sample Representativeness and Accuracy of Opt-in Panel Data." Available at http://www.knowledgenetworks.com/ganp/docs/KN-Calibration-Research-Note-2010-03-02.pdf

Dennis, J. Michael. 2010. "KnowledgePanel®: Processes & Procedures Contributing to Sample Representativeness & Tests for Self-Selection Bias." Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, and Charles A. DiSogra. 2010. "Does Providing Internet Access to Non-Internet Households Affect Reported Media Behavior for Latinos and Non-Latinos? Results from a Six-Month Longitudinal Survey." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

DiSogra, Charles, J. Michael Dennis, and Mansour Fahimi. 2010. "On the Quality of Ancillary Data Available for Address-Based Sampling." Presented at the 2010 Joint Statistical Meetings, Vancouver. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Erlina Hendarwan, J. Michael Dennis, and Charles A. DiSogra. 2010. "Analysis of Late Responders to Probability-based Web Panel Recruitment and Panel Surveys." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Garrett, Joe, J. Michael Dennis, and Charles A. DiSogra. 2010. "Non-response Bias: Recent Findings from Address-based Panel Recruitment." Presented at the 2010 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael, Larry Osborn, and Karen Semans. March 2009. "Comparison Study of Early Adopter Attitudes and Online Behavior in Probability and Non-Probability Web Panels." Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Dennis, J. Michael. 2009. "Description of Within-Panel Survey Sampling Methodology: The Knowledge Networks Approach." Available at http://www.knowledgenetworks.com/ganp/docs/KN-Within-Panel-Survey-Sampling-Methodology.pdf.

Dennis, J. Michael, Trevor Tompson, Mike Henderson, and Yelena Kruse. 2009. "Measures of Non-Traditional Media Consumption During the 2008 Presidential Campaign." Presented at the 2009 Annual Meeting of Midwest AAPOR, November 21, 2009.

Dennis, J. Michael, and Trevor Tompson. 2009. "Web Panel Studies of the 2008 Election: New Opportunities for Causal Analysis of Dynamic Change in the Electorate." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

Kruse, Yelena, Mario Callegaro, J. Michael Dennis, Stefan Subias, Mike Lawrence, Charles DiSogra, and Trevor Tompson. 2009. "Panel Conditioning and Attrition in the AP-Yahoo! News Election Panel Study." Presented at the 2009 Annual Conference of the American Association for Public Opinion Research. Available at http://www.knowledgenetworks.com/ganp/reviewer-info.html.

J. Michael Dennis, Rick Li and Joe Hadfield. 2007. "Results of a Within-Panel Survey Experiment of Data Collection Mode Effects Using the General Social Survey's National Priority Battery." Presented at the 2007 Annual Conference of the American Association for Public Opinion Research.

J. Michael Dennis and Rick Li. 2005. "Results from a Knowledge Networks' Question Wording Experiment for Political Party Identification." Available at http://www.knowledgenetworks.com/ganp/docs/kn-party-id-experiment-022805.pdf

J. Michael Dennis, Cindy Chatt, Rick Li, Alicia Motta-Stanko, Paul Pulliam. 2005. "Data Collection Mode Effects Controlling for Sample Origins in a Panel Survey: Telephone versus Internet." Available at http://www.knowledgenetworks.com/ganp/rtimode.html.

J. Michael Dennis and Rick Li. 2004. "Health Condition Prevalence Rates Between National Health Interview Survey (NHIS) and Knowledge Networks (KN)." Available at http://www.knowledgenetworks.com/ganp/docs/KNvsNHIS2.pdf

J. Michael Dennis and Rick Li. 2004. "Weighting Procedures Used for the Veterans Administration Prescription Medication Study." Available at http://www.knowledgenetworks.com/ganp/docs/061604_Weighting-Description.pdf.

J.Michael Dennis, Rick Li, and Cindy Chatt, 2004. "Benchmarking Knowledge Networks' Web-Enabled Panel Survey of Selected GSS Questions Against GSS In-Person Interviews." Knowledge Networks Report, February 2004. Available at http://www.knowledgenetworks.com/ganp/docs/GSS02-DK-Rates-on-KN-Panel-v3.pdf

Vicky Pineau and J. Michael Dennis. 2004. "Methodology for Probability-Based Recruitment for a Web-Enabled Panel." Knowledge Networks Report

J. Michael Dennis. 2003. "Panel Attrition Impact: A Comparison of Responses to Attitudinal and Knowledge Questions about HIV Between Follow-up and Cross-Sectional Samples." Available at http://www.knowledgenetworks.com/ganp/docs/HIV-Study-Panel-Attrition-Impact-Research-Note-2003.pdf

J. Michael Dennis, Rick Li, J.R. DeShazo and Trudy Ann Cameron. 2003. "Correcting for Sample Bias in Internet Panel Surveys based on RDD Sampling." Presented at the Joint Statistical Meetings, August 2003

Dennis, J. Michael, Rick Li. 2003. "Effects of Panel Attrition on Survey Estimates." Presented at the 2003 Annual Conference for the American Association for Public Opinion Research.

Selected Workshops, Expert Panels, and Seminars

Workshop Participant. Mapping the Global Online Probability based Panel Landscape. RISCAPE Workshop. Amsterdam, Netherlands.  December 11-12, 2019.

Member, Expert Panel.  New Direction for the National Household Travel Survey. Sponsored by the Federal Highway Administration. 2018-Present.

Featured Speaker.  AARP "Think In" on Surveys of Asian Americans and Pacific Islanders.  July 23-24, 2018. Washington, DC.

Expert Panel Participant, National Survey of Family Growth, U.S. Centers for Disease Control and Prevention, April 30, 2018 – May 1, 2018.

Panel Participant and Featured Speaker.  "Workshop:  Harnessing Technology to Reduce Attrition in Panel Surveys." Inter-American Development Bank.  Washington DC, October 2, 2017.

Featured Speaker.  Briefing Congress on the Legal Services Corporation New Report on *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans*.  Russell Senate Building, Washington DC, June 14, 2017.

Panel Participant in an Invited Panel Session entitled "Better, Faster, Smarter – Maintaining Research Quality in a World of Intense Budget Pressure."  Annual Meeting of the Southern Association for Public Opinion.  October 10, 2013.

"The NCRM Network of Methodological Innovation Web surveys for the general population: How, why and when?"  Workshop hosted by the University of Essex, Colchester, UK.  Presented the paper "Recommendations for Establishing a National Online Panel in the UK."  June 6-7, 2013.

"The Data Collection of the Future Has Already Started."  Seminar hosted by Willem Saris, RECSM, Universitat Pompeu Fabra in Barcelona.  Presented the paper  "Best Practices for Population-Based Online Surveys: Review of U.S. Methods Research."  July 2011.

"An International Workshop on Using Multi-level Data from Sample Frames, Auxiliary Databases, Paradata and Related Sources to Detect and Adjust for Nonresponse Bias in Surveys."  Sponsored by the National Science Foundation and hosted by NORC in Chicago.  June 2011.

"Innovative Survey Methods Workshop." Sponsored by the U.S. Department of Homeland Security and the Institute for Homeland Security Solutions.  December 2009.

"Sample Representativeness:  Implications for Administering and Testing Stated Preference Surveys."  Sponsored by EPA Cooperative Agreement CR83299-01 with the National Center for Environmental Economics, U.S. Environmental Protection Agency.  Hosted by the Resources for the Future. October 2, 2006.

"Recurring Surveys: Issues and Opportunities." Sponsored by the National Science Foundation. March 28-29, 2003.

Selected Guest Lecturer Assignments

George Washington University, University of California, Irvine, University of California, Berkeley, University of Michigan, University of Maryland, University of Pennsylvania, University of Southern California (USC), University of Texas, Austin, Stanford University.

Educational Honors
Century Fellowship, University of Chicago (1985-1988)
Phi Beta Kappa, University of Texas (1984-1985)
Honors in Government, University of Texas (1984)
Chapter President, Pi Sigma Alpha, University of Texas (1983-1984)
William Jennings Bryan Essay Winner, College of Liberal Arts, University of Texas (1983 and 1984)


Affiliations

American Association for Public Opinion Research (1992-), American Statistical Association, Member, AAPOR Online Task Force Report (2009-2010),  Chairman, Presumed Consent Subcommittee, Ethics Committee, UNOS (1992-1995), Member of Ethics Committee, the United Network for Organ Sharing (1992-1995), Member of Region 7, the United Network for Organ Sharing (1992-1995), American Political Science Association (1985-1994)